

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-3-1998

# Shade v. Great Lakes Dredge

Precedential or Non-Precedential:

Docket 97-2023

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Shade v. Great Lakes Dredge" (1998). *1998 Decisions.* Paper 212.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/212

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 3, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-2023

JOHN D. SHADE

v.

GREAT LAKES DREDGE & DOCK COMPANY,

  Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 97-00739)

Argued July 30, 1998

BEFORE: GREENBERG, SCIRICA, and MCKEE,
Circuit Judges

(Filed: September 3, 1998)

   Robert B. White, Jr. (argued)
   Rapp, White, Janssen & German,
    P.C.
   1800 John F. Kennedy Boulevard
   Suite 500
   Philadelphia, PA 19103

    Attorneys for Appellant

          Marvin I. Barish (argued)
          Marvin I. Barish Law Offices, P.C.
          Sixth & Walnut Streets
          The Curtis Center, Suite 801
          Philadelphia, PA 19106

           Attorney for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. JURISDICTION

Great Lakes Dredge & Dock Company appeals from a
final judgment entered in favor of appellee, John D. Shade,
on October 22, 1997, pursuant to a jury verdict for Shade
in the amount of $870,000, and from the denial of its
renewed motion to alter or amend the judgment, or, in the
alternative, for a new trial entered on November 19, 1997.
The district court had jurisdiction over this case under 28
U.S.C. S 1331, and this court has jurisdiction pursuant to
28 U.S.C. S 1291.

II. FACTUAL AND PROCEDURAL HISTORY

The U.S. Army Corps of Engineers awarded Great Lakes
a contract to dredge and renourish the beach at Cape May,
New Jersey, which Great Lakes began performing on
November 12, 1994. This project consisted of removing
sand from the ocean floor at offshore locations and
transferring the sand to the beach through 6600 feet of
steel pipe, known as the submersible line. See  app. at 637-
40. The dredge Long Island removed the sand from the
ocean floor; and once its hopper compartments were full,
the tug Conlon propelled the dredge to a self-contained
offshore transfer station buoy ("scots buoy"), a large round
floating buoy secured by four anchors. See id.  at 337, 689.
In order to transport the sand to the beach, the dredge
would secure itself to a pipe attached to the scots buoy
which in turn was connected to the submersible line. The

2

dredge then would pump its load of sand into the pipe and through the submersible line. Upon reaching the beach, the submersible line ended at a "Y" valve. This valve, which controlled the flow of the sand, connected the submersible line to an additional line, known as the shore line, extending in both directions along the beach parallel to the ocean. As the sand flowed out of either end of the shore line, bulldozers positioned the sand on the beach according to a predetermined plan.

Shade arrived at the Cape May worksite on the night of December 8, 1994, and began to work for Great Lakes at the site on December 9, 1994. See id. at 472. Since 1974, Shade had been employed by various companies to assist in such dredging projects; and in the four years prior to his injury, the majority of his work had been with Great Lakes. See id. at 468–69. Shade received his work assignments through his union, Local 25, Marine Division, International Union of Operating Engineers, AFL–CIO. When he was unemployed, Shade would place his name on the out-of-work list until Local 25 assigned him to a new job. See id. at 346–48, 519–20.

Great Lakes previously employed Shade from September 1992 until February 1994. See id. at 54–55, 509–10. However, beginning in March 1994, Shade worked for Bean–Weeks Joint Venture, another dredging contractor, as a deckhand. See id. at 55, 510. Bean–Weeks subsequently fired Shade, and he remained without work until Great Lakes hired him for the Cape May job.

Great Lakes asserted that it hired Shade for Cape May as a shoreman, see id. at 648, pursuant to its contract with Local 25 which mandated the hiring of a shoreman for this type of job. See id. at 69, 684–87. In fact, Great Lakes' superintendent, David P. Rappe, and the Local 25 union steward, Cecil C. Jackson, Sr., both testified that Great Lakes hired Shade as a shoreman. See id. at 687, 794; see also id. at 648 (testimony of deck captain James D. Joyner), 772–73 (testimony of shoreman Joseph H. Gurganus).

Shade, on the other hand, contended that Great Lakes hired him as a deckhand assigned to the anchor barge 110, which assisted in the dredging operation, see id. at 479,

3

and that the shore gang was already in place when he arrived to work at Cape May. See id. at 472. Both Shade and his supervisor, Mark Oldham, testified that he was employed primarily on the navigable waters off Cape May. See id. at 316–17, 473–84. In fact, Oldham testified that Shade was on the water 90% of the time that he worked at the Cape May project. See id. at 316–17.

When Shade arrived at Cape May, the submersible line had been laid, the scots buoy was in place, and the Long Island had begun to dig the first portion of sand from the ocean floor. See id. at 473, 642–43, 681–83, 793–94. The dredge filled its hoppers and connected to the scots buoy, but it was not able to pump the sand to the beach because of a hole in the submersible line. See id. at 157. As a result, from December 9th, when Shade began to work at Cape May, until the early morning hours of December 13th, Shade worked on the water assisting in the repair of the submersible line, see id. at 690–92, while assigned to anchor barge 110. See id. at 473–75.

After the workers completed the repair of the submersible line, the Long Island once again had the capacity to pump sand to the beach. However, between December 13th and December 30th, the dredge only operated from the evening of December 19th until December 22nd and from the evening of December 25th until December 30th because of poor weather conditions. See id. at 249–66, 694–99. Great Lakes presented evidence that during the periods of bad weather, Shade remained on the beach, assisting welders and waiting on standby in case the weather cleared. See id. at 601–02, 699–700, 745–46. Shade, on the other hand, contended that during poor weather he would work in the harbor which was protected from the rough seas. See id. at 311–14. For instance, Shade testified that he helped construct a second submersible line, see id. at 480, and assisted in repairing the scots buoy. See id. at 558–59; see also id. at 305–15 (testimony of Oldham).

Great Lakes offered testimony that when the dredge was able to pump sand to the beach, Shade performed the work of a shoreman on the beach. See id. at 695–99. For example, Shade assisted welders in securing the shore line, operated the "Y" valve, and put fuel in welding machines.

4

See id. at 536-37, 769. Shade disputed Great Lakes' account of his work between December 19th and December 22nd, and testified that he worked on the water during that period. See id. at 556. However, he did not dispute that he primarily worked on the beach performing these shore based duties from December 25th until December 30th. See id.

While working on the beach on December 30th, Shade assisted Oldham in refueling a welding machine, a procedure which required lifting the machine with a front-end loader. See id. at 485-87. While Oldham was operating the loader, the raised claw of the loader dropped unexpectedly and severed Shade's thumb. See id. at 486-88. Shade testified that even though doctors were able to reattach his thumb, see id. at 491, he basically has no use of the thumb, see id. at 501-02, and could not return to work in his prior capacity. See id. at 502-03.

After initially receiving benefits under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. S 901 et seq. ("LHWCA"), Shade filed a complaint against Great Lakes on January 31, 1997, seeking damages under the Jones Act, 46 U.S.C. app. S 688(a), and the general maritime law doctrine of unseaworthiness. On September 8, 1997, Great Lakes filed a motion for summary judgment on the ground that Shade was not a seaman. The district court denied this motion without opinion on September 24, 1997. On October 7, 1997, Great Lakes filed a motion in limine to preclude testimony at trial regarding Shade's prior employment with Great Lakes. The district court, however, deferred ruling on the motion and at the trial ultimately permitted Shade to introduce evidence of his prior employment. See app. at 54-55, 509-10.

A jury trial began on October 14, 1997, solely on the Jones Act claim. At the conclusion of the presentation of Shade's evidence, Great Lakes moved under Fed. R. Civ. P. 50 for a judgment as a matter of law on the ground that the evidence did not establish that Shade was a seaman at the time of his injury. See app. at 41, 589. However, the district court deferred ruling on that motion. See id. at 589. Great Lakes renewed its Rule 50 motion at the conclusion of all

5

of the evidence, see id. at 45, 844; and again, the district court deferred its ruling. See id. at 844.

The district court submitted a series of special interrogatories to the jury; and on October 21, 1997, the jury found that Shade was a seaman, and returned a verdict in his favor in the amount of $870,000. See id. at 946–47. Pursuant to this verdict, the district court entered judgment against Great Lakes on October 22, 1997. See id. at 7. Great Lakes subsequently filed a renewed motion to alter or amend the judgment pursuant to Fed. R. Civ. P. 50(b), or, in the alternative, for a new trial under Fed. R. Civ. P. 59. See app. at 7. However, the district court denied this motion on November 19, 1997, and Great Lakesfiled its timely notice of appeal on December 18, 1997. See id. at 7, 9.

III. DISCUSSION

A. Jones Act Seaman Status

The Jones Act provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury." 46 U.S.C. app. S 688(a). However, the Jones Act does not define the critical term"seaman" and thus "leaves to the courts the determination of exactly which maritime workers are entitled to admiralty's special protection." Chandris, Inc. v. Latsis, 515 U.S. 347, 355, 115 S.Ct. 2172, 2183 (1995). In a recent series of opinions, the Supreme Court has clarified this definition and has provided guidance as to how courts are to interpret this key term. See Harbor Tug & Barge Co. v. Papai, 520 U.S. 548, 117 S.Ct. 1535 (1997); Chandris, 515 U.S. 347, 115 S.Ct. 2172; Southwest Marine, Inc. v. Gizoni, 502 U.S. 81, 112 S.Ct. 486 (1991); McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 111 S.Ct. 807 (1991).

In developing a test for seaman status, the Court noted that prior cases recognized "a fundamental distinction between land-based and sea-based maritime employees." Chandris, 515 U.S. at 359, 115 S.Ct. at 2185. In enunciating this difference, the Court has focused"on the

6

nature of the seaman's service, his status as a member of the vessel, and his relationship as such to the vessel and its operation in navigable waters," id. at 359-60, 115 S.Ct. at 2185, and not on the situs of injury, because"land-based maritime workers do not become seamen because they happen to be working on board a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore." Id. at 361, 115 S.Ct. at 2186; see also Wilander, 498 U.S. at 355, 111 S.Ct. at 817 ("The key to seaman status . . . is employment-related connection to a vessel in navigation."). The rule as developed by the Supreme Court furthers the important goal of ensuring that a worker does "not oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured." Chandris, 515 U.S. at 363, 115 S.Ct. at 2187.

From these basic principles, the Court in Chandris set forth a two-part test to determine if an individual is entitled to Jones Act protection as a seaman:

> First, as we emphasized in Wilander, `an employee's duties must "contribut[e] to the function of the vessel or to the accomplishment of its mission.' " The Jones Act's protections, like the other admiralty protections for seamen, only extend to those maritime employees who do the ship's work. . . .
>
> Second, . . . a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and nature.

Id. at 368, 115 S.Ct. at 2190 (citations omitted). The Court also noted that although "seaman status is not merely a temporal concept, . . . it necessarily includes a temporal element." Id. at 371, 115 S.Ct. at 2191. In fact, both portions of the Chandris test contain such an element, because a court must determine how broad a time period to consider when evaluating both an employee's duties and his or her connection to a vessel in navigation. [1]

_____

1. In addition, the second portion of the test contains a direct measurement of time through its durational element.

In its appeal, Great Lakes focuses on this temporal concept. Specifically, Great Lakes argues that in evaluating an employee's duties under the initial prong of the seaman status test, the fact-finder must consider only the activities of an employee at the time of his or her injury. Great Lakes maintains that under this interpretation it is entitled to a judgment as a matter of law, because it contends that Shade was not acting as a seaman at the time of his injury. Alternatively, with respect to the latter portion of the seaman status test, Great Lakes asserts that only evidence regarding the employee's present assignment with his or her current employer is relevant and admissible to establish a substantial connection to a vessel in navigation. Thus, Great Lakes argues that if it does not receive a judgment as a matter of law, it is entitled to a new trial because the district court permitted Shade to introduce evidence regarding his prior employment history.

After considering these arguments, we hold that Great Lakes is not entitled to a judgment as a matter of law with respect to Shade's seaman status, because Shade presented sufficient evidence to create an issue of fact for the jury to consider. However, we will reverse the judgment entered against Great Lakes, and remand this case to the district court for a new trial, because the district court abused its discretion to admit evidence regarding Shade's prior employment history.2

B. Duties Of The Employee

Under the first portion of the Chandris seaman status test, an employee must demonstrate that his or her duties " `contribute to the function of the vessel or to the accomplishment of its mission.' " 515 U.S. at 368, 115 S.Ct. at 2190 (citation omitted). In satisfying this requirement, the seaman does not have to aid the vessel in navigation,

_____

2. Great Lakes also raised a number of other issues in its appeal, such as the failure to hold a charge conference, the alleged inadequacy of the district court's jury charge, and the lack of a set-off against the judgment for the amounts Shade received under the LHWCA; however, we will not reach these issues on this appeal as their resolution could not affect our result.

see Wilander, 498 U.S. at 353, 111 S.Ct. at 816; rather, the employee must merely "perform the work of the vessel." Id. at 355, 111 S.Ct. at 817.3 While this part of the Chandris test does not contain any express time component, such an element is implied, because a court must determine how broad a time period to consider when evaluating an employee's duties. Great Lakes argues for a narrow time limitation, stating that a court is to determine the seaman status of an employee solely based on "the activity in which he was engaged at the time of injury." Desper v. Starved Rock Ferry Co., 342 U.S. 187, 190, 72 S.Ct. 216, 218 (1952); see also Heise v. Fishing Co., 79 F.3d 903, 906–07 (9th Cir. 1996) ("The fact that if Heise performed well he might be hired to work on the ship when it left Seward if there were jobs available does not change his land-based status at the time the injury occurred." (emphasis added)). Applying this standard to the facts in this case, Great Lakes contends that it is entitled to a judgment as a matter of law, because Shade was ashore assisting in the refueling of a welding machine when he was injured.

The question of seaman status is often "fact specific," and "[i]f reasonable persons, applying the proper legal standard, could differ as to whether the employee was a `member of a crew,' it is a question for the jury." Wilander, 498 U.S. at 356, 111 S.Ct. at 818. However, "a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." Id. This court utilizes a plenary standard to review a grant or denial of a judgment as a matter of law. See Salas v. Wang, 846 F.2d 897, 902 (3d Cir. 1988). A court should grant such a motion only "if,

---

3. The Court in Wilander definitively resolved the "inconsistent use of an aid in navigation requirement" that arose between 1927 and 1946, "during which [time] the Court did not recognize the mutual exclusivity of the [LHWCA] and the Jones Act." Id. at 348, 111 S.Ct. at 814. The Court explained that "the better rule" was to define seaman status "solely in terms of the employee's connection to a vessel in navigation." Id. at 354, 111 S.Ct. at 817. This rule would ensure that the Jones Act would fulfill the purpose of protecting "[a]ll who work at sea in the service of a ship [and who] face those particular perils to which the protection of maritime law, statutory as well as decisional, is directed." Id.

9

viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).

Although the contours of the seaman status test remain difficult to apply, the Supreme Court has provided a number of relevant principles to guide our determination of this issue. First, the Court has emphasized that its status-based approach to the definition of the term seaman "determines Jones Act coverage without regard to the precise activity in which the worker is engaged at the time of the injury." Chandris, 515 U.S. at 358, 115 S.Ct. at 2185; see also id. at 363, 115 S.Ct. at 2187 ("[C]ourts should not employ `a `snapshot' test for seaman status, inspecting only the situation as it exists at the instant of injury; a more enduring relationship is contemplated in the jurisprudence.' " (quoting Easley v. Southern Shipbuilding Corp., 965 F.2d 1, 5 (5th Cir. 1992))). By not focusing exclusively on the activity of the employee at the time of injury, courts prevent a worker from oscillating"between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured." Id. at 363, 115 S.Ct. at 2187.

For instance, in Thibodeaux v. Torch, Inc., 858 F.2d 1048, 1049 (5th Cir. 1988), the plaintiff sued under the Jones Act for injuries he sustained while working ashore. The employer argued that it was entitled to summary judgment, because the plaintiff 's specific activities at the moment of his accident were not the work of a seaman, but rather were "traditional" duties of a longshoreman. Id. at 1050. The Court of Appeals for the Fifth Circuit rejected the employer's position and held that the specific activity at the time of injury was "only one factor" in the analysis of the employee's Jones Act seaman status. Id. at 1051; see also Smith v. Odom Offshore Surveys, Inc., 791 F.2d 411, 415 (5th Cir. 1986); Savoie v. Otto Candies, Inc. , 692 F.2d 363, 365 (5th Cir. 1982); Guidry v. South La. Contractors, Inc., 614 F.2d 447, 453 (1980); Higginbotham v. Mobil Oil Corp., 545 F.2d 422 (5th Cir. 1977), rev'd on other grounds, 436 U.S. 618, 98 S.Ct. 2010 (1978). Thus, contrary to Great

10

Lakes' position, the employee's specific activity at the time of his or her injury is not dispositive of the issue of seaman status.

Second, although an examination based solely on the specific activity at the time of injury is too narrow, the Supreme Court also has cautioned against too broad of a perspective in examining an employee's duties. In evaluating the duties of an employee under the seaman status test, courts should not consider an employee's entire work history, but must consider only the nature of the employee's basic job assignment as it existed at the time of injury. After all, as the Court has stated, "[w]hen a maritime worker's basic assignment changes, his seaman status may change as well." Chandris, 515 U.S. at 372, 115 S.Ct. at 2191. To illustrate this holding, the Court explained:

> For example, we can imagine situations in which someone who had worked for years in an employer's shoreside headquarters is then reassigned to a ship in a classic seaman's job that involves a regular and continuous, rather than intermittent, commitment of the worker's labor to the function of a vessel. Such a person should not be denied seaman status if injured shortly after the reassignment, just as someone actually transferred to a desk job in the company's office and injured in the hallway should not be entitled to claim seaman status on the basis of prior service at sea.

Id. at 372, 115 S.Ct. at 2191. Thus, while a court must not concentrate exclusively on the employee's specific activity at the time of injury, a court should limit its examination of the employee's duties to the employee's basic job assignment as it existed at the time of injury.

Applying these principles to the present appeal, we cannot say that Great Lakes is entitled to a judgment as a matter of law. Although Shade was on shore assisting in the refueling of a welding machine when he was injured, this activity cannot be the sole determining factor to resolve whether Shade was a seaman. Instead, we must view Shade's status in the larger context of his employment—

related duties. In deciding which duties to consider, a reasonable juror could conclude that Shade's entire performance at the Cape May job consisted of a single assignment, because his duties remained fairly constant during the pendency of that dredging operation. Under this broader analysis, Shade presented sufficient evidence such that a reasonable jury could determine that his duties during the Cape May job contributed to the function of a vessel or to the accomplishment of its mission. While working at Cape May, Shade spent a considerable amount of his time at the beginning of his employment working on the water with the anchor barge 110 to repair the submersible line. See app. at 473-75, 690-92. Beyond this initial placement, Shade presented evidence at trial that he spent significant time on the water as a deckhand on a vessel in navigation performing his job responsibilities. See id. at 311-14, 316-17, 473-84. Additionally, even Shade's duties on the beach were not unrelated to the work of a vessel in navigation; instead, they contributed to the purpose of the dredging operation. Viewing this evidence in a light most favorable to Shade, a reasonable juror could find that Shade's job responsibilities at Cape May consisted of a single job assignment and contributed to the function of a vessel in navigation, thereby satisfying thefirst requirement of the Chandris test. Thus, because Shade presented sufficient evidence for a reasonable juror to find in his favor, the district court correctly denied Great Lakes' motion for a judgment as a matter of law.4

C. Connection To A Vessel

Under the second part of the Chandris seaman status test, an employee must demonstrate that he or she has "a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and nature." 515 U.S. at 368, 115 S.Ct. at

_____

4. We note that in making this determination, we do not consider the evidence of Shade's prior employment history with Great Lakes, because as we hold below, such evidence is inadmissible, and thus cannot be considered by a court in deciding a motion for a judgment as a matter of law. See Lightning Lube, 4 F.3d at 1198-1200.

2190. Typically, this requirement is fulfilled by examining the employee's connection with the vessel to which he or she was assigned at the time of his or her injury. However, in certain circumstances, this connection might not be sufficient to meet the substantiality requirement of the seaman status test, even though the employee performs traditional seaman activities on a regular and continuous basis. For example, the employee's job responsibilities might require performance on a number of different vessels, rather than permitting a permanent connection to one vessel. Confronted with this problem, courts have enabled employees to fulfill the seaman status test by demonstrating that they are assigned to a fleet of vessels, rather than to only one vessel, under a doctrine known as the "Fleet Seaman Doctrine." See, e.g., Reeves v. Mobile Dredging & Pumping Co., 26 F.3d 1247, 1253–55 (3d Cir. 1994) (describing the development of the doctrine). In fact, the Chandris test contemplates this doctrine, because it expressly permits an employee to demonstrate a connection not only "to a vessel in navigation," but also"to an identifiable group of such vessels." 515 U.S. at 368, 115 S.Ct. at 2190. By permitting this aggregation, the Fleet Seaman Doctrine thus ensures that a seaman receives Jones Act coverage even though he or she is not assigned permanently to a specific vessel, but instead regularly performs seaman's work on different vessels. See Gizoni v. Southwest Marine Inc., 56 F.3d 1138, 1141 (9th Cir. 1995) ("Under the fleet seaman doctrine, one can acquire `seaman' status through permanent assignment to a group of vessels under common ownership or control.").

For instance, in Braniff v. Jackson Ave.–Gretna Ferry, Inc., 280 F.2d 523, 528 (5th Cir. 1960), John Braniff worked as the "Superintendent in charge of all maintenance, repair and overhaul work" for his employer. Id. at 525. In performing this job, he would travel from vessel to vessel, but would be stationed only temporarily at each vessel. Braniff subsequently drowned while repairing a machine on one of his employer's ferries. See id. Based on his limited contact with the ferry, Braniff could not establish a substantial connection to a single vessel in navigation even though his job required him to perform seaman's duties on a regular and ongoing basis. In holding that Braniff could

13

be a seaman under the Jones Act, the Court of Appeals for the Fifth Circuit permitted an aggregation of Braniff 's connections to the other vessels in the fleet beyond the single ferry he worked on immediately prior to his death, because he was " `assigned permanently' " to those vessels and performed " `a substantial part of his work on the' several specified `vessel(s).' " Id. at 528 (citing Offshore Co. v. Robison, 266 F.2d 769, 779 (5th Cir. 1959)).

We first considered the Fleet Seaman Doctrine in Reeves, 26 F.3d at 1256; and after determining that "the doctrine comports well with and flows logically from Supreme Court precedent," we adopted the doctrine as "the rule of law in this circuit in analyzing Jones Act cases." Id. We held that "[t]he Fleet Seaman Doctrine in our view applies to an employee, one who is predominantly assigned by his employer to a navigable vessel, but who occasionally is assigned by that same employer to non-navigable vessels. It would also apply to one who is assigned to a number of navigable vessels and spends some time on shore, as in Braniff." Id. Thus, we adopted the doctrine to afford Jones Act protection to these types of employees, because "stripping seaman status from such an employee, or allowing that same employee to oscillate between seaman and non-seaman status . . . would be a travesty of justice." Id.

In the present case, Shade had worked as a deckhand since 1974. See app. at 468. From September 1992 until February 1994, Great Lakes employed Shade as a deckhand. See id. at 54-55, 509-10. However, beginning in March 1994, Shade worked for Bean-Weeks. See id. at 55, 510. Great Lakes did not re-employ Shade until December 1994 for the Cape May job. See id. at 472. During trial, Shade sought to introduce evidence regarding his employment history under the Fleet Seaman Doctrine in order to satisfy the substantiality requirement of the Chandris seaman status test. Over the objection of Great Lakes, the district court permitted Shade to offer two types of prior employment evidence. First, Shade introduced a general account of his work history, with Shade testifying that he had been working on the water since 1974, see id. at 468, and had been a deckhand "all my life," id. at 479,

14

and with three other witnesses testifying that Shade had been a deckhand throughout his career. See id. at 617 (testimony of Thomas E. Chandler), 660-61 (testimony of Joyner), 809 (testimony of Jackson). Second, the district court admitted specific evidence regarding Shade's work history as a deckhand for Great Lakes from September 1992 until February 1994. See id. at 54-55, 468-69, 842.

In its appeal, Great Lakes maintains that it is entitled to a new trial because this prior employment evidence was not relevant to the determination of Shade's seaman status and thus should not have been admitted under Fed. R. Civ. P. 402.5 We exercise an abuse of discretion standard to review "a denial of a request for a new trial based on the district court's alleged error in ruling on the admissibility of evidence." Affiliated Mfrs., Inc. v. Aluminum Co. of America, 56 F.3d 521, 525 (3d Cir. 1995) (citing Lippay v. Christos, 996 F.2d 1490, 1496 (3d Cir. 1993)). However, where "the district court's decision rests on the application of legal precepts, we exercise plenary review." Failla v. City of Passaic, 146 F.3d 149, 153 (3d Cir. 1998). We will grant Great Lakes a new trial, because we hold that the district court abused its discretion in admitting evidence regarding Shade's prior work history.6

Even though the Fleet Seaman Doctrine permits an employee to aggregate contacts with multiple vessels, it is clear that these contacts must have occurred with vessels owned or controlled by the same employer. As the Supreme Court has stated, "[c]onsidering prior employments with independent employers in making the seaman status inquiry would undermine `the interests of employers and maritime workers alike in being able to predict who will be covered by the Jones Act . . . before a particular work day

_____

5. Rule 402 provides: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court, pursuant to statutory authority. Evidence which is not relevant is not admissible."

6. Arguably we should exercise plenary review on the evidence issue. Of course, if we did, we would reach the same result. Thus, we do not prejudice Shade by using an abuse of discretion standard.

15

begins.' " Harbor Tug, 117 S.Ct. at 1541 (quoting Chandris, 515 U.S. at 363, 115 S.Ct. at 2187). The Court held that without such a rule "[t]here would be no principled basis for limiting which prior employments are considered for determining seaman status." Id.; see also Reeves, 26 F.3d at 1257 (rejecting an attempt to introduce evidence of a prior employment with another employer under the Fleet Seaman Doctrine because the prior employment "was simply unrelated" to his present job).

When introducing evidence concerning his general work history, Shade and the other witnesses did not state with any specificity who employed him during his work career. However, undoubtedly at least a portion of this evidence concerned employment with employers other than Great Lakes. For instance, Shade testified that he worked for Bean-Weeks during a portion of 1994; and Shade provided evidence that out of his twenty year career, he worked for Great Lakes during the Cape May job and between September 1992 and February 1994. From this evidence, it is reasonable to conclude that this general work history evidence involved other employers beyond Great Lakes. Thus, because the evidence of Shade's general work history apparently referred to employment with independent employers, this testimony clearly was irrelevant to the determination of Shade's seaman status, and the district court abused its discretion to have permitted the jury to consider it.7

The admission of evidence concerning Shade's specific work history with Great Lakes poses a more difficult question. Typically, an employee introducing evidence of connections to other vessels in an employer's fleet under the Fleet Seaman Doctrine has worked for the same employer on a continual, uninterrupted basis. See, e.g., Braniff, 280 F.2d at 525-26. Shade's connections to other vessels in Great Lakes' fleet, however, did not concern a single employment period. Instead, Shade presented

_____

7. Even if Shade's employment prior to 1992 had been with Great Lakes our result would be the same, because as we hold below, such employment evidence is not admissible if the employment relationship was not continuous.

16

evidence of two distinct employment periods with Great Lakes in order to establish a substantial connection to a vessel in navigation: his final employment with Great Lakes from December 9, 1994, until December 30, 1994, and his previous employment with the company from September 1992 until February 1994. Between these two employment periods, Shade did not work for Great Lakes, and he had no connection to Great Lakes or the vessels in itsfleet. Rather, Bean-Weeks employed him. Thus, in this unusual situation, we must determine whether the Fleet Seaman Doctrine permits Shade to aggregate his prior assignments with Great Lakes and his work for the company at the Cape May job to establish a substantial connection to a vessel in navigation, even though he was not employed continuously by Great Lakes.

The Supreme Court's consideration of the substantiality prong of the Chandris seaman status test in Harbor Tug, 520 U.S. 548, 117 S.Ct. 1535, provides some guidance to resolve this issue. In that case, John Papai, an employee of Harbor Tug & Barge Company, was injured while painting a tugboat. See Harbor Tug, 117 S.Ct. at 1538. During the 2-1/4 years prior to his injury, Papai received various assignments with a number of different employers, including Harbor Tug, through a central union hiring hall. See id. at 1538. In fact, during the 2-1/2 months prior to his injury, Harbor Tug had employed Papai on 12 separate occasions. See id. at 1542. In attempt to establish a substantial connection to a vessel in navigation, Papai sought to introduce evidence of his prior employments with Harbor Tug and with other employers. See id. at 1540. After rejecting the evidence relating to other employers, the Court examined Papai's specific employments with Harbor Tug. See id. at 1542. Given the fact that Papai described a number of these jobs as non-deckhand work, the Court held that "it would not be reasonable to infer" that the rest of his employments with Harbor Tug were of a seagoing nature. Id. Thus, the contacts would not seem to assist Papai in establishing seaman status. More importantly, the Court stated "[i]n any event, these discrete engagements were separate from the one in question, which was the sort of `transitory or sporadic' connection to a vessel or group of vessels that . . . does not qualify one for seaman status." Id.

17

(citation omitted). Thus, the Court held that these prior assignments could not be used to establish seaman status because they were separate from Papai's present employment.

The Court of Appeals for the Fifth Circuit has addressed this question more directly in Patton-Tully Transp. Co. v. Ratliff, 797 F.2d 206 (5th Cir. 1986). In that case, Tommy Lee Ratliff worked for Patton-Tully Transportation Company from 1979 until he quit in May 1980; but he returned to the company in September 1980 and worked there until his death in March 1981. See id. at 208. Subsequently, his mother filed a claim under the Jones Act against the company, seeking to recover damages for the death of her son. See id. at 209. In evaluating Ratliff 's seaman status, the court confronted the question of whether it should consider both periods of Ratliff 's employment with Patton-Tully, or whether it only should consider Ratliff 's final period of employment with the company. The court held that it should focus solely on Ratliff 's final period of employment, because "the four-month hiatus in Ratliff 's employment was a significant break requiring separate evaluation of his duties during the re-employment period." Id. at 210. Thus, the court upheld the exclusion of evidence of a prior employment with the same employer, because the employee had not worked for the employer on a continuous basis. See also Reeves, 26 F.3d at 1256 ("The key to the Fleet Seaman Doctrine is that the seaman maintain the employment relationship with the same employer.").

Excluding such evidence is consistent with the Fleet Seaman Doctrine. Although the doctrine developed as a means to protect employees from losing seaman status "when on temporary non-navigable assignments or when assignments preclude attachment to one," Reeves, 26 F.3d at 1256, the doctrine specifically excludes individuals who perform seaman's work on multiple vessels, but do so as part of their employment with multiple employers. See Harbor Tug, 117 S.Ct. at 1541. The distinction developed in part because each new assignment with a different employer is distinct from the employee's prior jobs with other employers, and "[n]o principled basis" existed to limit "which prior employments are considered for determining

18

seaman status." Id. This distinction served the purpose of permitting "employers and maritime workers alike" to predict the Jones Act status of an employee based on the job for which the employer hired the individual, rather than based on the prior experiences of the employee with an independent employer. Id.

Applying this rationale to a situation where an employment relationship is terminated and subsequently the employer rehires the employee, the employee's posture is more akin to those excluded by the doctrine rather than those afforded protection under it. After the termination of the employment relationship, the employee severs any duties that the employee had towards the employer with respect to the performance of the former job. The employee does not have any ongoing or regular responsibilities relating to the vessels in the former employer'sfleet. Upon being rehired, the employee does not recapture that prior relationship. Instead, the employee adopts a prospective set of duties and responsibilities that may be distinct from the employee's former performance, and the connections the employee once had to any vessels in the employer'sfleet are thus separate from the employee's new status. In effect, the employment in the new position could be considered to be for an entirely different employer, and as such, evidence of the prior employment would have no relevance to the employee's later position with the employer. Thus, we hold that evidence of an employee's prior assignment with the same employer is not admissible under the Fleet Seaman Doctrine if those assignments were not part of a continuous employment relationship between the employer and employee.8

Shade severed all ties with Great Lakes and with his prior assignments with the company by working for Bean–Weeks. When Shade returned to Great Lakes after

_____

8. Conceivably there could be such a short interruption in an otherwise continuous employment relationship that it might be reasonable to regard the employment as practically continuous and thus to apply the Fleet Seaman Doctrine. Here, however, the interruption was not so short, and Shade worked for Bean–Weeks in the interim. These facts preclude a finding that Great Lakes' employment of Shade was practically continuous.

19

approximately ten months, his final employment only concerned the Cape May job and his duties during that dredging operation. He had no regular responsibilities that required him to move from vessel to vessel in Great Lakes' fleet; instead, he was hired for a distinct job and only could establish a connection to vessels being used at the Cape May dredging operation. Thus, because he did not maintain a continuous employment relationship with the company, the evidence of Shade's prior employment with Great Lakes was completely irrelevant to the determination of his seaman status, and the district court abused its discretion to have admitted this prior employment history into evidence.

Because the district court abused its discretion to admit Shade's prior employment history into evidence,"we must reverse unless we find that its admission was harmless error." Lippay, 996 F.2d at 1500. An error is harmless if "it is highly probable that the error did not substantially affect" the judgment. Id. The issue of seaman status was one of the central issues at trial and was the subject of a great deal of disputed evidence. The admission of Shade's prior work history was significant, because it permitted Shade to argue to the jury that he should be considered a seaman based on the status he held during his prior employment assignments and regardless of his actual status at Cape May. During closing arguments, Shade's counsel stated:

> [T]he Supreme Court has said that in evaluating the status of an individual, you do not look at what he was doing on the day of the injury, or even at the time of the injury. You look at Mr. Shade's history with this company Great Lakes.
>
> And if you do that, you will know that Mr. Shade has always been a seaman for Great Lakes . . . .
>
> And you also know that while he was on the beach [at Cape May] he was called out to perform functions on the sea. That is not necessary for you to find. You can find that he wasn't, and still determine he was a seaman, because, as the records will show, he has worked for Great Lakes for over four years, every time as a seaman, as a deck hand.

20

App. at 849. Because of the centrality of the issue and the extremely prejudicial use of this evidence, we cannot say that it is highly probable that the error did not affect the verdict.9 Therefore, we will reverse the judgment and remand this matter for a new trial in a matter consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

9. We do not preclude admission of evidence of the character leading to the reversal here if the evidence is admitted for a purpose other than to establish an employee's seaman status. Of course, in the event that such evidence is admitted, the district court should give an appropriate instruction as to its use.

21