

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-18-2003

# Calhoun v. Yamaha Motor Corp

Precedential or Non-Precedential: Precedential

Docket No. 02-4098

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Calhoun v. Yamaha Motor Corp" (2003). *2003 Decisions.* Paper 79.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/79

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed November 18, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 02-4098 & 02-4162

LUCIEN B. CALHOUN; ROBIN L. CALHOUN,
Individually and as Administrators of the
Estate of Natalie K. Calhoun, Deceased

v.

YAMAHA MOTOR CORPORATION, U.S.A.; YAMAHA
MOTOR CO., LTD.; PALMAS DEL MAR COMPANY;
PALMAS DEL MAR, INC.; PALMAS YACHT CLUB, INC.;
MARINA DE PALMAS YACHT CLUB, INC.; MAXXAM
PROPERTIES, INC.; ABC CORPORATION(S); XYZ
PARTNERSHIP(S); CANDELERO HOTEL CORPORATION;
MARINA DE PALMAS SHIPYARD, INC.

Lucien B. Calhoun; Robin L. Calhoun,
Individually and as Administrators of the
Estate of Natalie K. Calhoun, Deceased,
                    Appellants at No. 02-4098

Yamaha Motor Corporation, U.S.A.;
Yamaha Motor Co., Ltd.,
                    Appellants at No. 02-4162

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 90-cv-04295
(Honorable Louis H. Pollak)

Argued: July 29, 2003

Before: SCIRICA, *Chief Judge*, RENDELL and AMBRO,
*Circuit Judges*

(Filed: November 18, 2003)

> DAVID F. BINDER, ESQUIRE (ARGUED)
> A. ROY DeCARO, ESQUIRE
> Raynes, McCarty, Binder, Ross & Mundy
> 1845 Walnut Street, Suite 2000
> Philadelphia, Pennsylvania 19103
>
> > Attorneys for Appellants/Cross-Appellees, Lucien B. Calhoun; Robin L. Calhoun, Individually and as Administrators of the Estate of Natalie K. Calhoun, Deceased
>
> JAMES P. DONOVAN, ESQUIRE (ARGUED)
> Wilson, Elser, Moskowitz, Edelman & Dicker
> 150 East 42nd Street
> New York, New York 10017
>
> JONATHAN DRYER, ESQUIRE
> Wilson, Elser, Moskowitz, Edelman & Dicker
> The Curtis Center, Suite 1130 East
> Sixth and Walnut Streets
> Philadelphia, Pennsylvania 19106
>
> > Attorneys for Appellees/Cross-Appellants, Yamaha Motor Corporation, U.S.A. and Yamaha Motor Co., Ltd.

## OPINION OF THE COURT

SCIRICA, *Chief Judge*.

In this products liability claim under maritime law, a jury rendered a defense verdict. The principal issue on appeal is the proper application of Federal Rule of Evidence 702 to the proffered testimony of plaintiffs' experts.

**I.**

Because this matter has been twice before our court, *see Calhoun v. Yamaha Motor Corp., U.S.A.*, 40 F.3d 622 (3d Cir. 1994); *Calhoun v. Yamaha Motor Corp., U.S.A.*, 216 F.3d 338 (3d Cir. 2000), and also before the Supreme Court, *see Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199 (1996), its tragic facts have been well documented. But we detail certain facts as they relate to the matters currently under appeal.

In June 1989, twelve-year-old Natalie Calhoun was vacationing with her friend, thirteen-year-old Melanie Fox, and Melanie's family at the Palmas del Mar resort in Puerto Rico. On June 6, Melanie's mother, Corinne Fox, gave permission to the girls to rent a jet ski at the marina. Melanie and Natalie rented a Yamaha Wavejammer WJ500G Personal Water Craft from nineteen-year-old Samuel Roffe, a beach concessionaire at the Palmas del Mar resort. Affixed to the jet ski was a warning that the minimum recommended age for operation was fourteen. Neither girl had ridden a jet ski before.

In Natalie's presence, Roffe gave Melanie ten minutes of instruction. No parents or guardians were present at this time. While Melanie was riding the jet ski, her mother arrived at the marina. Roffe assured Mrs. Fox that riding the jet ski was "safe." After Melanie's uneventful thirty minute ride, she reported that the jet ski was "fun" and "easy."

When it was Natalie's turn, she was uncertain and expressed doubts. Mrs. Fox left the decision to Natalie, and eventually, she elected to ride. Roffe asked Natalie whether she was the requisite fourteen years of age, and she responded affirmatively. Roffe then gave her the same instructions given to Melanie. Natalie mounted the machine and began her ride in the lagoon near the resort.

Unlike Melanie, however, Natalie struggled and fell off while attempting to turn. Alarmed by this development, Mrs. Fox urged Roffe to "bring her back." Roffe rode out to Natalie in another jet ski, but by the time he reached her, she had remounted and assured him she was "okay." Natalie restarted the jet ski, made a sudden turn, and

planed at high speed across the lagoon toward an anchored boat. As she approached the boat, she screamed but did not appear to attempt to veer away. Roffe testified she appeared "frozen" and "scared stiff." Tragically, Natalie crashed into the boat and died from massive head and neck trauma.

Natalie's parents, Lucien and Robin Calhoun, brought suit against Yamaha Motor Company, Ltd. and Yamaha Motor Corporation, U.S.A., the manufacturer and distributor of the jet ski.[1] The Calhouns asserted several bases for recovery, including strict liability, negligence, and breach of implied warranties of merchantability and fitness for a particular purpose. Plaintiffs focused on an alleged defect with the design of the jet ski's accelerating mechanism, which is referred to as a "squeeze finger throttle" and resembles the braking mechanism on a bicycle. Plaintiffs also alleged the warnings were inadequate. The warning on the foot well of the jet ski provided in part:

> 3. MINIMUM RECOMMENDED OPERATOR AGE: 14
>
> A MINOR USING THIS WATER VEHICLE REQUIRES CLOSE ADULT SUPERVISION. CHECK FEDERAL/ STATE LAWS FOR MINIMUM AGE REQUIREMENTS.

After several appeals, the suit went to trial.[2] A jury rendered a verdict for defendants.

At trial, the District Court made several rulings that plaintiffs challenge on appeal. Although the District Court permitted plaintiffs' three expert witnesses to testify, it limited the extent of their testimony. Moreover, the District Court refused to submit the negligence claims to the jury, holding that plaintiffs could proceed only on their strict liability claims.[3] Furthermore, in jury interrogatories[4] and

---

1. The Calhouns brought suit individually and as administrators of their daughter's estate. Yamaha Motor Company, Ltd. and Yamaha Motor Corporation, U.S.A. are collectively referred to as Yamaha.

2. Of note, we determined that "federal maritime standards govern the adjudication" of Yamaha's liability. *Calhoun*, 216 F.3d at 351.

3. At the close of evidence, Yamaha moved for judgment as a matter of law under Fed. R. Civ. P. 50 on both the negligence and strict liability claims. The District Court granted the motion as to the negligence claims but denied it as to the strict liability claims.

4. The interrogatories first asked the jury to determine whether the jet

instructions,[5] the District Court applied comparative fault

---

ski had a defective design and/or a defect due to an inadequate warning, which was a substantial factor in causing Natalie's death. Only if the jury determined that the jet ski was defective in such manner was the jury to proceed to the interrogatories concerning Roffe and Palmas del Mar. These latter interrogatories asked:

5. Do you find that Samuel Roffe and/or Palmas del Mar were negligent?

    Yes___    No___

6. Do you find that the negligence of Samuel Roffe and/or Palmas del Mar was a substantial factor in causing Natalie Calhoun's death?

    Yes___    No___

7. Having found that Yamaha manufactured and sold a defective Wavejammer that was a substantial factor in causing Natalie Calhoun's death, and that the negligence of Samuel Roffe and/or Palmas del Mar was a substantial factor in causing Natalie Calhoun's death, what do you find to be the relative fault of those substantial factors? You are to express this conclusion in percentages, and the total must be 100%.

Defect(s) of Yamaha Wavejammer:    ___%

Negligence of Samuel Roffe and/or Palmas del Mar:    ___%

---

Total:    <u>100%</u>

5. The court instructed the jury:

It is for you, the jury, to determine whether the Wavejammer was defective and whether any defect was a substantial factor in causing Natalie Calhoun's death. If you should determine that her injuries were so caused, you will have two additional issues to consider.

First, you will be responsible for determining whether Samuel Roffe and/or [Palmas del Mar], neither of whom, of course, is a party to this litigation, were negligent. And whether that negligence also was a substantial factor in causing Natalie Calhoun's death.

And if the answer to that question is in the affirmative, you will also have to apportion the fault between Yamaha, Samuel Roffe, and [Palmas del Mar] in percentage terms.

principles and conditionally asked the jury to consider the negligence of two non-parties to the suit.

The jury returned a verdict in favor of Yamaha on the strict liability claims. The Calhouns appeal, arguing that errors made by the District Court require reversal and a new trial.[6] Yamaha cross-appeals, contending the District Court should have precluded the testimony of plaintiffs' experts altogether and granted its motion for summary judgment.

## II.

Plaintiffs proffered three expert witnesses to testify at trial. After conducting extensive *Daubert* hearings including individual voir dire, the District Court determined that all could testify but limited the extent of their testimony. We review for abuse of discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997) ("[A]buse of discretion is the appropriate standard" for "reviewing a trial court's decision to admit or exclude expert testimony.").[7]

Fed. R. Evid. 702 governs the admissibility of expert testimony. The Rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

6. We have jurisdiction under 28 U.S.C. § 1291.

7. In regard to Defendants' cross-appeal, we do not believe the District Court abused its discretion in allowing plaintiffs' experts to testify on a limited basis. In any event, the District Court granted defendants' motion for judgment as a matter of law on the negligence claims, and the jury returned a verdict in favor of defendants on the strict liability claims. This outcome will not be disturbed. As such, any alleged error in allowing plaintiffs' experts to testify is without consequence.

Fed. R. Evid. 702. Amended in 2000, Fed. R. Evid. 702 represents the logical outgrowth and memorialization of the Supreme Court's landmark cases establishing the standards for admitting expert testimony.[8] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court charged trial judges with the responsibility of acting as "gatekeepers" to exclude unreliable expert testimony, *id.* at 597, and in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), clarified that this "gatekeeper" function applies not only to testimony based on "scientific" knowledge but to testimony based on "technical" and "other specialized" knowledge as well. *Id.* at 141.[9]

We have addressed the requirements of Fed. R. Evid. 702, focusing on the "trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003). First, the witness must be qualified to testify as an expert. Qualification requires "that the witness possess specialized expertise." *Id.* "We have interpreted this requirement liberally," holding that "a broad range of knowledge, skills, and training qualify an expert as such." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) ("*Paoli II*"). Second, the testimony must be reliable. In other words, "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Id.* at 742 (quoting *Daubert*, 509 U.S. at 590). An assessment of "the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." *Id.* Third, the expert testimony must "fit," *id.* at 743, meaning "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 405.

---

8. The Advisory Committee on Evidence Rules noted that Fed. R. Evid. 702 was amended in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and cases applying *Daubert*. Fed. R. Evid. 702 advisory committee's note.

9. Fed. R. Evid. 702 "affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony." Fed. R. Evid. 702 advisory committee's note.

Here, the dispute centers on the second element, whether the proffered testimony of plaintiffs' experts was reliable. While defendants asserted the experts' qualifications were lacking in general, the thrust of their challenge was that the proposed testimony did not derive from scientific methods and procedures, but was simply unsupported opinion. In this respect, the District Court held that certain aspects of the experts' proposed testimony lacked proper foundation and was inadmissible.

In determining whether testimony is reliable, we are guided by several factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Paoli II*, 35 F.3d at 742 n.8. In assessing reliability, a court need not rely exclusively on this list and may take into account any other relevant factors, *id.* at 742; however, this list provides an ample starting point.

With this framework in mind, we examine each expert's proposed testimony. The District Court carefully and thoughtfully restricted testimony that offered opinions on specific matters without reliable foundation. For example, the District Court declined to permit testimony on the proper age requirement for jet ski operators, without any specific support—such as studies or data indicating that persons above a certain age are more capable of operating the jet ski. While the background, education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions.

## A.

Plaintiffs proffered Dr. Edward W. Karnes to testify that the jet ski was defectively designed because riders would

accidentally activate the throttle by clenching their hands as a "stress reaction." Plaintiffs also proffered Dr. Karnes to testify that the warnings on the jet ski should have restricted operation to those sixteen and older. The District Court prevented Dr. Karnes from testifying on these matters.

Dr. Karnes holds a doctorate in experimental psychology and is an emeritus professor of psychology at Metropolitan State College in Denver. Among his specialties is human factors engineering.[10] He worked as a human factors engineer at the Martin Marietta Corporation in Denver, serving as the head of human factors research for six years. Although defendants stress that Dr. Karnes has no degree in engineering and lacks expertise in marine vessel design or operations, the District Court qualified him as an expert because of his extensive experience in general design and operations.

An expert may be generally qualified but may lack qualifications to testify outside his area of expertise. The District Court allowed Dr. Karnes to describe the squeeze finger throttle on the jet ski and to testify that because of the throttle's similarity to a bicycle brake, a child in a stress situation would naturally squeeze the mechanism in order to stop the jet ski. Dr. Karnes's other theory was not permitted—that as a "stress reaction," a person would have a tendency to clench her hands, which would inadvertently activate the squeeze finger throttle of a Yamaha jet ski. Furthermore, Dr. Karnes was not permitted to offer an overall conclusion that the design of the throttle was defective.

With respect to warnings, the District Court allowed Dr. Karnes to testify in general about how to design an effective warning. Dr. Karnes was also permitted to opine that the warning on the jet ski deviated from the proper criteria, making the "vehicle unreasonably dangerous and defective, especially for youthful operators." But the District Court prohibited Dr. Karnes from testifying that, in addition to its

_____

10. Dr. Karnes explained that human factors engineering "is concerned with an evaluation of the human factors that are involved in the design and use of products, equipment, and facilities."

other alleged flaws, the warning on the jet ski should have restricted operators to those sixteen and older because Dr. Karnes did not have "anything to say to support that number rather than a number higher or lower."

The District Court gave Dr. Karnes some leeway in testifying about certain matters. Dr. Karnes's general knowledge of human factors engineering, along with his review of the record evidence, provided an adequate basis for his general description of the accelerating mechanism. But there was no support for Dr. Karnes's opinion on an asserted "tendency" to clench hands as a "stress reaction." There was no literature confirming this theory, nor demonstrable tests. Lacking support, his testimony was speculative and unreliable. With no reliable foundation, the District Court did not abuse its discretion by prohibiting any conclusory statements on the throttle's design.

Similarly, Dr. Karnes's general knowledge in the fields of psychology and human factors engineering may allow him to testify regarding proper warnings in general. But proffering admissible testimony that the proper age for jet ski use is sixteen or above requires more specific knowledge. The District Court did not abuse its discretion in prohibiting Dr. Karnes's proffered opinion that sixteen must be the minimum age.

**B.**

Plaintiffs proffered Albert Bruton to testify that Yamaha's accelerating mechanism was not as safe as other alternative designs and that Yamaha's warning should have limited operation to those sixteen and older. The District Court refused to allow the proffered testimony.

Bruton, a lieutenant for San Diego's Marine Safety Services for sixteen years, had extensive experience with jet skis. He also had some experience designing warning signs for public use, such as signs designating certain marine areas for particular purposes, although he never designed a warning label for a jet ski or any other product sold to the public. Bruton had also conducted "aquatic related accident" investigations. As defendants note, Bruton lacks

formal education or training in engineering, psychology, or human factors.

Bruton's testimony was also restricted. The District Court allowed Bruton to explain how jet skis operate and the differences between Yamaha's jet ski and other brands and models. Bruton was also permitted to discuss various accelerating mechanisms, explaining how each type works. A videotape was played showing Bruton riding a jet ski. But Bruton was prohibited from opining as to which jet skis, and particularly which accelerating mechanisms, were safer because the District Court found his "ranges of experiences" did not give him the expertise or knowledge to make this determination.

The District Court permitted Bruton to testify about how to frame an effective warning in general, for example, how words should be arranged and lettered. But the District Court prohibited him from opining on the proper substance of a particular warning, including proposed testimony that jet ski operations should be restricted to those sixteen and older.

These limitations were well considered. Because Bruton was knowledgeable about different types of jet skis and their operation, it was appropriate for him to explain such matters to the jury. But as noted, Bruton had no education or experience in product design of jet skis or accelerating mechanisms; nor did he provide scientific, statistical or other evidence evaluating the relative safety of different jet ski models or their accelerating mechanisms. Bruton had neither the general background nor the specific knowledge to support his proffered testimony that the "squeeze finger throttle" was less safe than other designs.

With respect to warnings, Bruton was given much leeway, especially considering he had never designed a warning for any consumer product. As for his proffered testimony on the specific substance of such warnings, particularly the age requirement, Bruton offered no support for his beliefs. His proffered opinions on these matters were unreliable, and the District Court properly restricted such testimony. There was no abuse of discretion.

## C.

Plaintiffs proffered Dr. Robert A. Warren to testify that the accelerating mechanism was unsafe because it resembled a bicycle brake and that Yamaha's warnings were inadequate. The District Court restricted Dr. Warren's testimony on these matters.

Dr. Warren has a bachelor's degree in naval architecture and marine engineering, as well as higher degrees in other fields. He worked with the Navy and the Department of Defense and served as an accident reconstruction consultant with a focus on marine engineering and boat accidents. Defendants acknowledge that Dr. Warren's qualifications are generally sufficient, and the District Court correctly held that his background qualified him to testify as an expert.

But as with the other experts, the District Court restricted the specifics of Dr. Warren's testimony. The District Court allowed Dr. Warren to describe the squeeze finger throttle on the jet ski but forbade his proffered testimony that the throttle was unsafe particularly due to its similarity to a bicycle's braking mechanism. The District Court also prohibited Dr. Warren from offering testimony about warnings.

Although Dr. Warren possessed expertise in relevant fields, he failed to apply this expertise to the matter at hand. At the time he wrote his expert report, Dr. Warren had never operated a jet ski and, by the time of trial, had only managed to ride a different model. Moreover, on voir dire, Dr. Warren admitted he had never examined diagrams of the different throttles used on jet skis. Dr. Warren's asserted knowledge of possible alternatives to the accelerating mechanism came from his familiarity with outboard motors, which employ a twist grip mechanism, and from his recollection of a friend's motorcycle, which used a thumb throttle. Dr. Warren acknowledged he could have conducted tests to evaluate the relative merits of alternative throttle designs but did not do so. With such a paucity of knowledge regarding the specifics of jet ski accelerating mechanisms, Dr. Warren was unable to give reliable testimony on whether Yamaha improperly employed

the squeeze finger throttle on its jet ski. Although Dr. Warren had sufficient knowledge to describe the throttle mechanism in general, the District Court properly precluded him from giving further opinions on the matter.

Similarly, Dr. Warren lacked any specific basis on which to opine on the adequacy of Yamaha's warnings. Moreover, in contrast to his background in naval architecture and marine engineering, which provided Dr. Warren the foundation to testify generally about mechanical issues, he possessed no expertise with regard to warning design. Thus, the restriction on testimony regarding warnings was proper. There was no abuse of discretion.

## III.

Plaintiffs contend that the District Court erred at the close of evidence in granting defendants' motion for judgment as a matter of law on their negligence claims. *See* Fed. R. Civ. P. 50. We exercise plenary review. *See, e.g.*, *Shade v. Great Lakes Dredge & Dock Co.*, 154 F.3d 143, 149 (3d Cir. 1998) ("This court utilizes a plenary standard to review a grant . . . of a judgment as a matter of law.").

Negligence claims are cognizable in admiralty and may be asserted in addition to strict liability claims. *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 865-66 (1986). But the question here is whether plaintiffs' evidence supported these claims. The District Court explained that, while the negligence claims were "there in the complaint," they "ha[d] not . . . survived in any real sense" during the course of the trial. As such, the District Court held that the negligence claims "ha[d] not been made out" and could not be submitted to the jury.

We agree. It is clear that the focus of the trial evidence was on plaintiffs' strict liability claims. Plaintiffs provided only cursory theories of Yamaha's alleged negligence and offered scant support to sustain them. The negligence claims should not have been submitted to the jury. Judgment as a matter of law was proper.

## IV.

Plaintiffs argue the District Court erred in submitting to the jury the possible comparative negligence of Roffe

and/or Palmas del Mar, neither of which were party to this suit. According to plaintiffs, rules of joint and several liability should govern, and the possible negligence of non-parties cannot be considered. As plaintiffs allege an error of law, our review is plenary. *See, e.g.*, *Harris v. City of Philadelphia*, 47 F.3d 1342, 1349 (3d Cir. 1995).

Though we think it likely there was no error, given our other rulings, any error would be harmless. It was harmless because the court's instruction could not have affected the jury's verdict on the strict liability claim, in that the jury decided as a threshold matter, that the jet ski was not defective. In instructing the jury, the District Court stated:

> Now, members of the jury, if and only if you decide that the Wavejammer was defective in a way that proximately caused Natalie's death, you must then consider whether [Roffe and/or Palmas del Mar] committed negligent acts that contributed to the accident.

Furthermore, the interrogatories clearly provided that the first issue to be considered was whether Yamaha's jet ski was defective. The possible negligence of Roffe and/or Palmas del Mar mattered only if Yamaha were liable. Because the jury found that the jet ski was not defective, it never reached the possible negligence of Roffe and/or Palmas del Mar.

In this respect, the matter here is similar to that addressed in *Dillinger v. Caterpillar, Inc.*, 959 F.2d 430 (3d Cir. 1992). In *Dillinger*, plaintiff sued under strict liability for injuries he sustained while driving a vehicle manufactured by defendant. *Id.* at 432. The district court allowed defendant to introduce evidence that plaintiff was not wearing a seat belt but only for considering mitigation of damages. *Id.* We held that it was error for the district court to allow such evidence because "the introduction of . . . non-use of the seat belts would be directly at odds with the [state] Supreme Court's dictates barring evidence of a plaintiff's negligence in [strict] liability proceedings." *Id.* at 439. But we concluded that such error was harmless because the jury had determined that the defendant's product "was either not defective or that the defect was not

a substantial factor in causing the accident," and thus the jury never reached the issue of seat belt use. *Id.* at 440. While plaintiff argued "that the jury was influenced by the evidence concerning [his] failure to use the available lap belt in determining whether [defendant's] product was defective or whether a defect caused [plaintiff's] injuries," the court had to "assume that the jury was competent to follow and did follow the instructions given." *Id.* at 440 n.17.[11]

11. As noted, in holding that any possible error was harmless, we do not mean to suggest there was in fact error. Although we need not decide, the District Court was likely correct in submitting the conditional interrogatories on the possible negligence of Roffe and/or Palmas del Mar.

There is joint and several liability in tort suits under admiralty law. But admiralty law also adheres to principles of comparative fault. *See* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5-4 (3d ed. 2001) (explaining that both joint and several liability and comparative fault exist in admiralty tort actions and noting that comparative fault still applies in cases of strict product liability, "even though this requires a comparison of negligence and strict liability"). The intertwining of these concepts was addressed by the Supreme Court in *McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994), which provides instruction for the matter at hand.

In *McDermott*, the plaintiff settled with certain alleged tortfeasors, and another alleged tortfeasor was immune from damages because of contractual provisions with the plaintiff. *Id.* at 204-05. In the suit, the plaintiff sought damages from yet another alleged tortfeasor, River Don Castings, Ltd. ("River Don"). *Id.* The Court held that River Don was only responsible for its proportionate share of liability. The Court explained:

> Joint and several liability applies when there has been a judgment against multiple defendants. It can result in one defendant's paying more than its apportioned share of liability when the plaintiff's recovery from other defendants is limited by factors beyond the plaintiff's control, such as a defendant's insolvency. When the limitations on the plaintiff's recovery arise from outside forces, joint and several liability makes the other defendants, rather than an innocent plaintiff, responsible for the shortfall. [In contrast], the proportionate share rule announced in this opinion applies when there has been a settlement. In such cases, the plaintiff's recovery against the settling defendant has been limited not by outside forces, but by its own agreement to settle. There is no reason to allocate any shortfall to the other defendants, who were not parties

## V.

For these reasons, we will affirm the judgment of the District Court.

---

to the settlement. Just as the other defendants are not entitled to a reduction in liability when the plaintiff negotiates a generous settlement, so they are not required to shoulder disproportionate liability when the plaintiff negotiates a meager one.

*Id.* at 220-21 (citations and footnotes omitted).

Although Roffe and Palmas del Mar did not settle with plaintiffs here, nor is there immunity resulting from contract, the comparative negligence rule announced in *McDermott* would still apply. Notably, Roffe and Palmas del Mar are not parties to this suit because of the voluntary acts of the Calhouns. Palmas del Mar was originally a defendant in this case but was dismissed by plaintiffs. Roffe was a defendant in companion actions brought and dismissed by plaintiffs in Florida and Puerto Rico. As such, the Calhouns' "recovery against [the two] has been limited not by outside forces, but by [their own decision]." *Id.* at 221. The Supreme Court explained that under such circumstances, defendants should only be responsible for their proportionate share of liability. The District Court was apparently correct in seeking a determination of the relative fault of the relevant entities if the jet ski was determined to be defective.

At least one court has come to a similar conclusion. In *Siegler v. Grace Offshore Co.*, 663 So. 2d 212 (La. Ct. App. 1995), the plaintiff sued his employer, the employer's insurer, and a crew boat operator for injuries he allegedly sustained while offloading equipment from a drilling vessel. *Id.* at 213. The plaintiff later voluntarily dismissed his claims against his employer and its insurer. *Id.* at 214. As such, the court explained that the crew boat operator could only be held responsible for his proportionate share. *Id.* at 215. The court stated:

Although there has not been a settlement *per se* in this case, the plaintiff voluntarily dismissed his claims against [his employer and its insurer] with prejudice. For purposes of the proportionate allocation of fault, we discern no distinction between a settlement and a voluntary dismissal. Both are agreements entered into by the plaintiff which serve to limit his recovery as opposed to the outside forces such as insolvency or statutory immunity discussed in *McDermott.*

*Id.*

17

A True Copy:
    Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*